860

PARTIDO POPULAR DEMOCRÁTICO ET AL., demandantes y recurridos, *v.* PEDRO ROSSELLÓ GONZÁLEZ ET AL., demandados y peticionarios; ISABEL PÉREZ PÉREZ ET AL., demandantes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO ET AL., demandados y peticionarios; RUBÉN BERRÍOS MARTÍNEZ ET AL., demandantes y recurridos, *v.* PEDRO ROSSELLÓ GONZÁLEZ ET AL., demandados y peticionarios; EUDALDO BÁEZ GALIB ET AL., demandantes y recurridos, *v.* COMISIÓN ESTATAL DE ELECCIONES ET AL., demandantes y peticionarios.

*Números:* CE-94-584  *Resueltos:* 2 de septiembre de 1994
CE-94-588

*Jorge C. Pizarro, Marie Elsie López Adames, Lizzette Vélez Rivé,* de *Domínguez & Totti,* abogados de la Compañía de Turismo de Puerto Rico, peticionaria; *Pedro A. Delgado Hernández, Procurador General,* y *Carlos Lugo Fiol, Subprocurador General,* abogados del Estado Libre Asociado de Puerto Rico, peticionario; *David Rivé Rivera,* abogado de la Comisión Estatal de Elecciones, peticionario; *Luis Sánchez Betances* y *Gerardo de Jesús Annoni,* abogados del Partido Popular Democrático, recurrido; *Carlos I. Gorrín Peralta, Manuel Rodríguez Orellana* y *Gilberto Concepción Suárez,* abogados del Partido Independentista Puertorriqueño, recurrido; *Eudaldo Báez Galib, pro se,* y *Eduardo René Estades,* abogados de Movilización Civil, recurridos; *José Enrique Colón Santana* y *Edgardo M. Román Espada,* abogados de los recurridos.

## RESOLUCIÓN

Examinada la solicitud en auxilio de jurisdicción presentada por el Sr. Rubén Berríos Martínez, el Partido Independentista Puertorriqueño y el Sr. Manuel Rodríguez Orellana, en su escrito de Oposición a los Recursos de *Certiorari*, en el cual solicitan que le ordenemos a la Comisión Estatal de Elecciones (C.E.E.) que en auxilio de nuestra jurisdicción dicho organismo cese y desista de inmediato de gastar los fondos asignados por la Ley Núm. 49 de 2 de agosto de 1994 (16 L.P.R.A. sec. 956 *et seq.*) hasta tanto se haya resuelto definitivamente si el esquema de financiamiento dispuesto en dicha ley es constitucional, se dispone lo siguiente:

Vista la necesidad de que todo lo relacionado con este caso se resuelva con la premura y con la urgencia que el asunto del referéndum del próximo 6 de noviembre requiere, se remite el planteamiento aludido al tribunal de instancia para que en un término de cinco (5) días, contados a partir de la notificación de esta resolución —y luego de escuchar a las partes y a la C.E.E.— evalúe y resuelva esta petición.

Estando pendientes ante el tribunal de instancia los cuestionamientos constitucionales sobre la referida ley, es prematuro que pasemos juicio sobre ellos en esta etapa de los procedimientos.

*Notifíquese de esta resolución a la Comisión Estatal de Elecciones.*

*Notifíquese por correo y por la vía telefónica.*

Lo acordó el Tribunal y certifica el señor Secretario General. La Juez Asociada Señora Naveira de Rodón emitió un voto explicativo de conformidad. El Juez Asociado

Señor Negrón García emitió una opinión disidente. El Juez Asociado Señor Rebollo López emitió una opinión disidente.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

Como adjudicación pura de derecho, de su faz surgen los vicios para declarar inconstitucional la Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994 (en adelante Ley Habilitadora), Ley Núm. 49 de 2 de agosto de 1994 (16 L.P.R.A. sec. 956 *et seq.*) y a la vez de inmediato paralizar el desembolso de fondos públicos por la Comisión Estatal de Elecciones (en adelante C.E.E.).

En el fondo estamos una vez más ante la figura patológica de la *partidocracia*, anatema de una verdadera *democracia*. La historia se repite; sólo han cambiado los protagonistas principales y la específica controversia político-partidista que ha de ser sometida al electorado. Hace casi tres (3) años era el "Referéndum" denominado Reclamación de Derechos Democráticos propulsado por el entonces Gobernador Honorable Rafael Hernández Colón; hoy, el "Referéndum" sobre tres (3) enmiendas constitucionales impulsado por el actual Primer Ejecutivo Honorable Pedro Rosselló González. Una misma circunstancia los une, a saber, el reclamo de poder usar los fondos públicos, sin límites, para llevar a cabo una masiva campaña publicitaria para exaltar la obra gubernamental bajo el palio de "informar" a la ciudadanía.

Como diferencia detectamos que ahora el foro judicial a través del Tribunal Superior, Sala de San Juan (Hon. Gil-

berto Gierbolini, hijo, Juez), dictaminó su ilegalidad. Así acogió los razonamientos expuestos en nuestra opinión disidente en *Gierbolini Rodríguez v. Gobernador*, 129 D.P.R. 402 (1991), en que sostuvimos la inconstitucionalidad de esa práctica. Reiteramos y ampliamos ese curso decisorio.

## I

*Primero*, por todos es conocido que "[l]as agencias de publicidad cuentan con expertos conocedores de la conducta humana. Ideas, imágenes, detalles visuales y gráficos aparentemente *insignificantes pueden esconder solapadamente un mensaje político*. Por lo tanto, no podemos abstraernos de los adelantos de la industria de las comunicaciones y del desarrollo de complejas técnicas para encubrir mensajes. *Así, podría sustituir la burda y repudiada práctica de la compra del voto por una refinada fórmula que penetra el inconsciente del elector.* De esta manera, un ingenioso anuncio radial o televisivo puede ser una fina argucia para encubrir un mensaje político-partidista". (Énfasis suplido.) *P.N.P. v. Hernández, Srio. D.T.O.P.*, 122 D.P.R. 362, 388–389 (1988), opinión concurrente.

Y, *segundo*, "[l]os jueces no viven en un vacío. Sabemos lo que el resto de la comunidad sabe". *Pueblo v. Marrero*, 79 D.P.R. 649, 658 (1956). "Cuando los hechos son suficientemente abrumadores, hasta los tribunales pueden tomar conocimiento judicial de los mismos, y de ese modo evitar en parte la censura expresada por Bentham al efecto de que el arte de la jurisprudencia consiste en desconocer metódicamente lo que todo el mundo sabe." (Énfasis suplido.) *Ballester v. Tribunal de Apelación*, 61 D.P.R. 474, 507–508 (1943).

Al respecto, tomamos conocimiento de que una vez aprobada la Ley Habilitadora se inició una masiva y costosa campaña publicitaria que saturó de anuncios los medios de

comunicación —televisión, radio y prensa— para resaltar la imagen gubernamental, tales como, "La gente pobre con esto ha solucionado el problema de sus males ... Esta es una de las cosas mejores que ha hecho el Gobierno ... A los que critican la tarjeta, que la saquen para que vean que se van a sentir tan feliz como yo, *con la tarjeta de Rosselló.* ESE ES EL PODER DE SALUD"; "Pisándole los talones a los maleantes ... Policía de Puerto Rico: Haciendo lo que nos toca"; "El turismo está trabajando ... Hemos logrado traer 150,000 más turistas que antes ... El turismo está trabajando para tí, creando más empleos ahora", y "Autoridad de Energía Eléctrica: Brillando hacia el futuro".

Reafirmamos el prisma judicial pertinente: *"la preeminencia del derecho al sufragio.* En nuestro país, incuestionablemente existe un 'mandato insoslayable en la Carta de Derechos[, Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1] imponiéndole la obligación [a la Asamblea Legislativa] de *garantizar* —palabra clave— la *pureza* del sistema electoral. Proviene de "garante", esto es, que da garantía, asegurando y protegiendo algo contra algún riesgo o necesidad'. (Énfasis en el original.) *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, supra, 294–295." (Escolio omitido.) *Gierbolini Rodríguez v. Gobernador,* supra, pág. 413, opinión disidente.

¿Podemos negarle filiación constitucional a la prohibición de anuncios gubernamentales? Los principios de alta moralidad pública que inspiran esta *prohibición* en la Ley Electoral de Puerto Rico están inmersos en el axioma de igualdad electoral que late en la Constitución; *en la necesidad de un juego justo electoral.* Rechazamos, pues, la distinción que nos proponen los peticionarios Honorable Rosselló González *et al.*, entre elecciones generales y referéndum; *en ambos se ejercita el sufragio electoral y, por ende, la Asamblea Legislativa viene obligada a "garanti-*

*zar"* que el proceso responda a la voz de la conciencia del elector, "libre de toda coacción".

El clima de desventaja creado con una campaña de publicidad de este género tiende a *viciar* el debate y es una muestra de inmadurez política que debilita la democracia. "Es hora de desterrar de nuestro suelo la PARTIDOCRA-CIA, *esto es, la creencia de que el Gobierno y el partido político mayoritario son una misma cosa.* De acuerdo con nuestra Constitución, es axiomático que si la conducta en la cual se incurrió es ilegal o atenta contra las sanas normas jurídicas, o administrativas vigentes para el mejor desembolso de fondos públicos, ni la lealtad de un ciudadano —incluso la de los funcionarios públicos hacia su partido político— ni la obediencia jerárquica son defensas válidas." (Énfasis en el original suprimido y énfasis suplido.) *A.E.E. y A.A.A. v. P.N.P.*, 128 D.P.R. 294, 299 (1991), voto concurrente.

Estamos ante la modalidad de *enriquecimiento injusto electoral,* pues tales gastos incrementan indirecta, pero sustancialmente, las arcas del partido que el Gobierno controla en exceso de los límites de las asignaciones autorizadas en el Fondo Electoral. Constitucionalmente no puede prevalecer.

## II

Por estas razones consideramos inmeritorios los planteamientos de los peticionarios, Rosselló González *et al.*, en particular el de la Compañía de Turismo que sostiene que el referéndum no es de naturaleza político-partidista, sino "cívico-social". Invoca la Resolución mayoritaria de este Tribunal de 4 de agosto de 1994, que en contravención a la Constitución, los cánones de ética y la mejor tradición judicial, permitieron a los jueces involucrarse en una campaña oficial *contra* la propuesta enmienda de aumentar el número de miembros de este Foro.

El barniz de legitimidad que se le ha pretendido dar, a base de la tesis de que estamos ante unas propuestas "cívicas", sólo convence a los ingenuos. Las enmiendas constitucionales objeto del referéndum son claramente de carácter político-partidistas; del adjetivo "cívico" únicamente tienen la definición de ser "[r]elativo a la ciudadanía o a los ciudadanos como colectividad política". *Diccionario general ilustrado de la lengua española*, Barcelona, Ed. Bibliograf, 1973, pág. 365. Más allá de ese ingenioso juego de palabras, "[b]asta un breve repaso a los debates de la Asamblea Constituyente, a las actuales posiciones de los partidos políticos, Partido Nuevo Progresista (P.N.P.), Partido Popular Democrático (P.P.D.) y Partido Independentista Puertorriqueño (P.I.P.), y a las manifestaciones de sus líderes, para así confirmarlo". *In re Vigencia,* supra, opinión disidente.

### III

Aclarados estos extremos, concentramos en lo realmente medular, el pedido de los demandantes recurridos Rubén Berríos Martínez, el P.I.P. y su Comisionado Electoral Manuel Rodríguez Orellana, a los efectos de que ordenemos a la C.E.E. que se abstenga de hacer erogaciones de los fondos asignados por la Ley Habilitadora para la campaña educativa.

Resumen así sus planteamientos:

> *[E]l mensaje que habrá de comunicar la Comisión Estatal de Elecciones en su llamada campaña de "orientación" sobre el contenido de las enmiendas va dirigido a promover que el electorado acuda a votar a favor de las enmiendas propuestas. Esto es así particularmente en vista de la negativa gubernamental de financiar públicamente a los partidos políticos principales que interesan comunicar un mensaje en contra de la aprobación de las enmiendas.* En ausencia de financiamiento para los partidos políticos, la C.E.E. saturará los medios con cerca de $2,000,000 en anuncios en dos meses, ahogando las voces que, tenues por falta de fondos suficientes, se podrán oponer a la aprobación de las enmiendas. Aunque el Presidente de la C.E.E. no tenga la

intención de favorecer ni desfavorecer ninguna posición o enmienda, su interpretación supuestamente "neutral" le hace cómplice de un partido de gobierno que por medio de la Ley Habilitadora ha pretendido monopolizar abusivamente el mercado de las ideas con saturación de anuncios pagados con fondos públicos a favor de acudir a las urnas a "votar por" las enmiendas, a la vez que se niega a facilitar el saludable debate de las ideas que necesita la democracia mediante el financiamiento público de las campañas de la oposición. (Énfasis en el original.) Caso Núm. CE-94-588, Parte II, Oposición a recursos de *certiorari* y solicitud en auxilio de jurisdicción, pág. 7.

El señalamiento ensancha las puertas decisorias de este Tribunal. Nos fuerza a reproducir los principios aplicables a todo referéndum, según nuestro disenso en *Gierbolini Rodríguez v. Gobernador*, supra. Expongámoslos.

*Primero, cualquier referéndum o consulta sometida al electorado no puede ser engañosa.* La ambigüedad —intencional o no— en el lenguaje de cualesquiera propuestas es incompatible con nuestra Constitución y democracia. La razón es sencilla: "SABIDO ES QUE EL IDIOMA POSEE, ENTRE SUS MÚLTIPLES ELEMENTOS, LA POSIBILIDAD DE RESULTAR AMBIGUO. Esto es, las palabras no siempre informan directa e inequívocamente. En esos casos ocurre entonces un resultado que niega la esencia misma de la lengua: UN PROBLEMA DE INCOMUNICACIÓN." (Énfasis en el original.) *Granados v. Rodríguez Estrada V*, 127 D.P.R. 1, 349 (1991), opinión disidente. Ello significa que las propuestas han de ser específicas y claras. En sus particulares esenciales han de cumplir con los requisitos estatutarios y constitucionales.

*Segundo*, el referéndum es *nulo* si se celebra con restricciones que impiden al elector emitir libremente su expresión, esto es, depositar su voto individual e inteligente.

*Tercero*, aunque usualmente no es menester someter —mediante su inclusión en la papeleta— *todo* el texto de ley, su validez exige que se brinde a la ciudadanía el conocimiento cabal de las propuestas y sobre lo que van a votar. Es *imperativo*, además, que en la *papeleta se incluyan y aparezcan todos* los elementos informativos necesarios para una decisión racional, ilustrada y completa. Ello incluye las consecuencias y efectos de un voto afirmativo o negativo. La existencia sustancial de un vacío insalvable entre la ley, estos extremos y la papeleta anulan *a priori* el referéndum.

*Cuarto*, el criterio judicial para evaluar la validez y suficiencia legal de la papeleta a usarse es si la misma brinda al elector

la alternativa de votar a favor o en contra de determinada(s) propuesta(s). Ese examen judicial se realiza visualmente a base de lo que sólo revela el documento de la papeleta —tal y como es presentada al elector— *vis-á-vis* la ley; y, claro está, sin ignorar la información *oficial* diseminada al respecto.

*Quinto*, la obligación legislativa de garantizar la pureza electoral y la libre expresión conlleva que las propuestas sometidas a la ciudadanía estén presentadas de forma constitucionalmente apropiada; deben brindar a los electores suficiente oportunidad para expresar su libre voluntad. Dicho de otro modo, en un referéndum constitucionalmente no pueden someterse dos (2) o más propuestas juntas, de modo tal que la expresión del elector sobre una conteste las otras.

Y *sexto*, es inconstitucional la combinación de varias propuestas de derechos que, por su presentación unitaria o en bloque, *obliguen* al elector a contestar afirmativa o negativamente todos los derechos, aun cuando de su faz exista incompatibilidad. Constitucionalmente sólo pueden presentarse en bloque si *todas* las distintas partes de las propuestas así englobadas están evidente y naturalmente relacionadas, no son incompatibles y, al ser unidas, forman de hecho una sola, completa y armoniosa.

En síntesis, el análisis jurídico final es si existe una relación natural entre todas las propuestas incluidas en la papeleta. Si de un lado hay propuestas que contienen sujetos separados e independientes, entonces no son susceptibles a combinarse en la papeleta como una sola. Estaríamos claramente ante el propósito ilegal de juntarlas para lograr acumular votos para todas. Ello, en sus dos (2) alternativas —afirmativa o negativa— atentaría contra la libre expresión del elector. (Énfasis en el original suprimido y énfasis suplido.) *Gierbolini Rodríguez v. Gobernador*, supra, págs. 418–419, opinión disidente.

## IV

Frente a estos principios tienen razón los recurridos Berríos Martínez *et al.*, al sostener que el mandato en la Ley Habilitadora, a los efectos de que la instrucción al calce de la papeleta "especificará claramente que el elector *votará separadamente por cada una de las enmiendas propuestas*, y que *tiene la opción de votar por todas o por sólo algunas* de las propuestas", es susceptible de interpretarse como un intento de "influir al elector a votar a favor de las tres

enmiendas. Después de todo, 'votar por' una cosa, en el lenguaje común, significa 'votar a favor'. Para mantener la neutralidad en unas instrucciones sobre cómo votar en una decisión de 'Sí' o 'No', sería preciso indicar que el elector *votará separadamente a favor o en contra de cada una de las enmiendas propuestas*, y que *tiene la opción de votar a favor o en contra de todas o de sólo algunas de las propuestas"*. (Énfasis en el original.) Caso Núm. CE-94-588, Parte II, Oposición a recursos de *certiorari* y solicitud en auxilio de jurisdicción, pág. 6.

La cuestión reviste gran seriedad y nos traslada ineludiblemente al examen de la papeleta bajo la óptica constitucional. El Art. 2 de la Ley Habilitadora, *supra*, 16 L.P.R.A. sec. 956a, omitió exigir que en la papeleta se transcriban los textos *vigentes* sobre fianza (derecho absoluto) y la facultad del Tribunal Supremo de variar su composición que se intentan eliminar. Como consecuencia, para el elector *no* aparecerán *"todos* los elementos informativos necesarios para una decisión racional, ilustrada y completa"*. (Énfasis en el original.) *Gierbolini Rodríguez v. Gobernador*, supra, pág. 418.

Como la papeleta no contendrá ese texto, el elector *únicamente* votará a favor o en contra de aumentar a nueve (9) los miembros de este Tribunal. Sin embargo, ¿qué de la actual cláusula facultativa que poseemos a los efectos de que "[e]l número de sus jueces sólo podrá ser variado por ley, a solicitud del propio Tribunal Supremo"? Art. V, Sec. 3, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 356. No es necesario mucho esfuerzo mental para percatarse de la necesidad de que deben incluirse los textos vigentes de la fianza y el Tribunal Supremo. Sin ellos el elector no podrá compararlos para votar con conocimiento de causa. "El [SÍ] o el [NO], como adverbios afirmativo y negativo excluyentes entre sí, representan las formas más drásticas y extremas de comunicar asentimiento o rechazo. En lógica, tiene que ser producto del juicio, esto es, de una 'operación de

entendimiento'. Implica 'la comparación de dos ideas para conocer y determinar sus relaciones'. *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1970, T. II, pág. 774." *Gierbolini Rodríguez v. Gobernador,* supra, pág. 433.

Asumiendo que en la campaña "educativa" la Comisión Estatal difundiera el texto íntegro vigente y el propuesto, ello no subsanaría este grave vicio constitucional; estaríamos dependiendo de la buena o mala memoria de cada elector. No cabe argumentar que el señalamiento es técnico. En lo referente a enmiendas a nuestra Constitución, los tribunales hemos de exigir la más escrupulosa observancia de los principios rectores que garantizan el sufragio.

La omisión en la papeleta de los textos vigentes sobre el derecho absoluto a fianza y la facultad del Tribunal Supremo para originar modificaciones en su composición, es defecto *sustancial.* Si añadimos la ausencia de símbolos que orienten al elector analfabeto estamos ante dos (2) vicios que afectan la legitimidad del referéndum. "En toda comunicación hay un emisor que envía un mensaje y un receptor que lo recibe. Distinto a otros, en este referéndum no se proveen *símbolos o figuras geométricas* para identificar las propuestas y atender la emisión de votos por aquel sector de ciudadanos que lamentablemente están sumergidos en la obscuridad del analfabetismo. Es chocante que la Asamblea Legislativa haya actuado así en contravención de la admonición constitucional de que '[n]adie será privado del derecho al voto por no saber leer o escribir...'. Art. VI, Sec. 4, Const. E.L.A., *supra*, pág. 367." *Gierbolini Rodríguez v. Gobernador*, supra, pág. 436.

## V

Las circunstancias expuestas surgen de un simple análisis de la Ley Habilitadora. Nos mueven a coincidir con los

recurridos Berríos Martínez *et al.*, en que debimos paralizar el desembolso de fondos públicos que hizo la C.E.E. Se trata de unas lagunas que a priori afectan la pureza, legitimidad y confiabilidad de los resultados del referéndum. *Existe un insalvable abismo entre el texto de ley, implantación de la campaña oficial, la papeleta y nuestra Constitución.* Correspondería a la Asamblea Legislativa subsanarlas. No concebimos que este Tribunal se convierta en el diseñador de una papeleta que va a contener una propuesta eliminación en torno a una de sus prerrogativas fundamentales.

Por interacción del Art. 5 de la Ley Habilitadora, *supra,* 16 L.P.R.A. sec. 956d, y la Ley Electoral de Puerto Rico, la fecha límite para la C.E.E. ordenar la impresión de las papeletas y preparar los paquetes para su oportuna distribución es el 21 de septiembre. *Por estas razones disentimos.* No se debió posponer la cuestión hasta que el tribunal de instancia pasara juicio. A fin de cuentas, es razonablemente anticipable que cualquiera que sea, su dictamen regresará a este foro, *único* facultado para decidir la inconstitucionalidad de una ley. ¿Por qué demorar la cuestión? ¿Por qué permitir que se incurra en más desembolsos de fondos públicos? ¿Por qué dejar que los partidos políticos menguen sus limitados fondos electorales?

*En fin,* ¿por qué someter a Puerto Rico a semejante costo económico y espiritual?

## — O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Una somera lectura de la, *aparentemente "inofensiva",* Resolución que emite una mayoría de los integrantes del Tribunal en el día de hoy —mediante la cual, so color de la "premura y urgencia" que el asunto tiene, se remite al tribunal de instancia la solicitud de "auxilio de jurisdicción"

que ante este Tribunal radicara el Partido Independentista Puertorriqueño (P.I.P.) y se dispone que el foro de instancia resuelva el planteamiento contenido en la misma en el término de cinco (5) días— *nos hace recordar varios "refranes populares"; los cuales resultan curiosamente aplicables a la presente situación.*

La *determinación mayoritaria* que hoy se hace por el Tribunal constituye, a nuestro juicio, aviso suficiente *para el "buen entendedor"* —aquél para quien "con pocas palabras basta"— de que la mayoría de los integrantes del Tribunal, con toda probabilidad, *ya decidió* declarar inconstitucional la Ley Núm. 49 de 2 de agosto de 1994 (16 L.P.R.A. sec. 956 *et seq.*), conocida como la Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994 (en adelante Ley Habilitadora del Referéndum de 1994) y/o enmendar judicialmente la misma a su antojo, y que todo lo que falta es *meramente* que la Mayoría *plasme por escrito* dicha determinación mayoritaria.

Realmente no cabe otra inferencia o interpretación de la acción mayoritaria ya que, de la Mayoría entender lo contrario, *no* hubiera "acogido" la referida moción en auxilio de jurisdicción. Esto es, la Mayoría meramente hubiera despachado con un simple, y fundamentado, no ha lugar dicha improcedente solicitud y/o le hubiera indicado, *si acaso*, al P.I.P. que radicara, *en el momento oportuno*, su "queja o querella" ante la Comisión Estatal de Elecciones, conforme lo establecen los artículos pertinentes de la vigente Ley Electoral de Puerto Rico.

Ello así ya que, examinada la solicitud de "auxilio de jurisdicción" radicada por el P.I.P. desde una perspectiva correcta y objetiva, salta a la vista y hiere la retina que dicha solicitud *no sólo* es una totalmente carente de méritos *sino que* no es otra cosa que una queja, *prematura y altamente especulativa*, sobre la forma y manera en que la Comisión Estatal de Elecciones *habrá* de llevar a cabo, *se-*

*gún lo presume el P.I.P.*, su labor durante el período pre referéndum.

¿Por qué razón la mayoría del Tribunal, *en lugar de incurrir en este transparente error*, sencillamente no resuelve, *de una vez y por todas*, el caso? Esto es, ¿por qué no publican y certifican en estos momentos una Opinión del Tribunal declarando inconstitucional la citada Ley Núm. 49. *La contestación es relativamente sencilla*: no resulta fácil para la mayoría de este Foro salvar el obstáculo de la *ausencia o falta de jurisdicción* del Tribunal para así hacerlo en esta etapa de los procedimientos.

Ello constituye un verdadero "dolor de cabeza" para la Mayoría. Como se dice popularmente, habría "que hilar bien fino" para que el Tribunal, *en estos momentos*, se abrogara jurisdicción sobre el asunto y procediera a declarar, y decretar, que la citada Ley Habilitadora del Referéndum de 1994 es inconstitucional. Dicha actuación, aún para la mayoría de este Tribunal, resulta ser demasiada osada.

I

Es de público conocimiento, dada la masiva publicidad que ha recibido el asunto, que ante el Tribunal Superior de Puerto Rico, Sala de San Juan, se radicaron varias demandas —contra el Estado Libre Asociado, la Comisión Estatal de Elecciones, y la Compañía de Turismo de Puerto Rico— en las cuales se alegó, en síntesis y en lo pertinente, que la citada Ley Núm. 49 es inconstitucional por diversos motivos; razón por la cual se solicitó del foro de instancia una determinación a esos efectos y una orden prohibitiva de la ejecución de la referida Ley.

El tribunal de instancia, luego de la celebración de una vista, *consolidó* todas las demandas radicadas y le concedió término al Estado para que mostrara causa por la cual dicho foro no debía determinar que al mencionado "referéndum" le es aplicable las disposiciones del Art. 8.001 de

la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351; ello en virtud de las disposiciones del Art. 5 de la propia Ley Núm. 49, ante, 16 L.P.R.A. sec. 956d. El Estado cumplió con lo ordenado.

Mediante "resolución y orden", de 17 de agosto de 1994, el tribunal de instancia resolvió que las disposiciones del referido Art. 8.001 de la vigente Ley Electoral de Puerto Rico, efectivamente le son aplicables al "referéndum" a ser celebrado el 6 de noviembre de este año. En consecuencia, le ordenó a la Comisión Estatal de Elecciones que nombrara una "Junta de Anuncios", para la cual provee dicho artículo de ley, con el propósito de que "ésta [Junta] pueda EVALUAR la necesidad de publicación de todo anuncio gubernamental hasta el día del Referéndum". Caso Núm. CE-94-588, *Exhibit* I, pág. 00007.

Esto es, el tribunal de instancia, no obstante *posponer* la decisión sobre el asunto principal planteado, el de la constitucionalidad de la Ley Habilitadora del Referéndum de 1994, entendió procedente, en el entretanto, *prohibir* que el Estado publicara anuncios sin el permiso y consentimiento de la Junta de Anuncios que crea la vigente Ley Electoral de Puerto Rico; tal y como si se tratara de una elección general. Nada más y nada menos.

Inconformes, acudieron ante este Tribunal —vía *certiorari*— tanto los codemandados Estado Libre Asociado de Puerto Rico como la Compañía de Turismo de Puerto Rico en revisión de la mencionada determinación interlocutoria. En síntesis, plantearon que había errado el tribunal de instancia al aplicar, al "referéndum" en controversia, las disposiciones del citado Art. 8.001 de la Ley Electoral de Puerto Rico, el cual, sostienen, únicamente es aplicable a una elección general.

Mediante Resolución de 19 de agosto de 1994, una Sala Especial de Verano([1]) consolidó ambos recursos y, a los fi-

---

([1]) Compuesta la misma por el Juez Presidente Señor Andréu García y los Jueces Asociados Señora Naveira de Rodón y Señor Alonso Alonso.

nes de evaluar los mismos, le concedió término a *todas* las partes "para que se expresen sobre estos recursos". Íd. En cumplimiento de esta Resolución han comparecido tanto las partes demandantes recurridas como las partes demandadas peticionarias.

Así las cosas, el codemandante P.I.P., y dentro de la comparecencia que presentara, radicó una solicitud de "auxilio de jurisdicción". En la misma, en síntesis y en lo pertinente, solicitó de este Tribunal que emitiera una orden, o *injunction* preliminar, *paralizando* la *campaña de publicidad educativa* que, *en cumplimiento de la citada Ley Núm. 49*, entiende dicho partido político que *llevará* a cabo *la Comisión Estatal de Elecciones* en el período pre referéndum.

Expuso el P.I.P., *en apoyo de tan inusitada, prematura, e improcedente solicitud*, lo siguiente:

> [E]l mensaje que habrá de comunicar la Comisión Estatal de Elecciones en su llamada campaña de "orientación" sobre el contenido de las enmiendas va dirigido a promover que el electorado acuda a votar a favor de las enmiendas propuestas. Esto es así particularmente en vista de la negativa gubernamental de financiar públicamente a los partidos políticos principales que interesan comunicar un mensaje en contra de la aprobación de las enmiendas. En ausencia de financiamiento para los partidos políticos, la C.E.E. saturará los medios con cerca de $2,000,000 en anuncios en dos meses, ahogando las voces que, tenues por falta de fondos suficientes, se podrán oponer a la aprobación de las enmiendas. Aunque el Presidente de la C.E.E. no tenga la intención de favorecer ni desfavorecer ninguna posición o enmienda, su interpretación *supuestamente* "neutral" *le hace cómplice* de un partido de gobierno que por medio de la Ley Habilitadora ha pretendido monopolizar *abusivamente* el mercado de las ideas con saturación de anuncios pagados con fondos públicos a favor de acudir a las urnas a "votar por" las enmiendas, a la vez que se niega a facilitar el saludable debate de las ideas que necesita la democracia mediante el financiamiento público de las campañas de la oposición. (Énfasis suplido y en el original.) Caso Núm. CE-94-588, Parte II, Oposición a recursos de *certiorari* y solicitud en auxilio de jurisdicción, pág. 7.

Aparte del hecho de que las expresiones antes transcri-

tas constituyen un, *gratuito e inmerecido*, ataque a la integridad y honestidad de los integrantes de la Comisión Estatal de Elecciones —en especial, al Presidente de dicha Comisión— *resulta meridianamente claro que la solicitud que se hace es una errónea, prematura y totalmente carente de méritos.*

En primer lugar, resulta ser diáfanamente claro que la Comisión Estatal de Elecciones tiene la *obligación legal* de promover *la participación* de *todo* elector debidamente calificado *en todos y cada uno* de los comicios o sufragios que, *mediante ley a esos efectos*, se lleven a cabo y se celebren en Puerto Rico. Decir que una campaña educativa y orientadora, de parte de la Comisión, que tenga el propósito de "promover que el electorado acuda a votar", en un referéndum o plebiscito, necesariamente significa o conlleva que se está, ilegalmente, instando o motivando al electorado a votar "a favor" de uno u otro de los asuntos envueltos en los mismos resulta ser, a nuestra manera de ver las cosas, *un absurdo tan grande que el mismo no merece comentario adicional.*

Por otro lado, tal parece ser que la representación legal del Partido Independentista Puertorriqueño *tiene el poder, o facultad, de la más absoluta clarividencia.* Habrá notado el lector que, *desde este momento o etapa de los procedimientos*, el P.I.P. *puede predecir con exactitud* el "mensaje que *habrá* de comunicar la Comisión Estatal de Elecciones" (énfasis suprimido y en el original, Caso Núm. CE-94-588, ante) *en el futuro* a la ciudadanía en general; lo cual le permite al P.I.P. "saber", *por adelantado*, que "la C.E.E. *saturará* los medios [de comunicación] con cerca de $2,000,000 en anuncios" ilegales. (Énfasis suplido.) Íd. Los abogados, *todos*, tenemos que por necesidad ser ingeniosos e imaginativos y, hasta cierto punto, un tanto clarividentes. Ahora bien, aseverar y asegurar —sin temor a equivocarse— que la Comisión Estatal de Elecciones *llevará* a cabo una campaña educativa ilegal, *y basar una*

*petición formal al foro judicial sobre una aseveración total-
mente especulativa,* realmente es ir muy lejos.

En tercer lugar, desde ahora se le imputa al Presidente
de la Comisión Estatal *"complicidad"* con el "partido de
gobierno que por medio de la Ley Habilitadora ha preten-
dido monopolizar abusivamente el mercado de las ideas
con saturación de anuncios pagados con fondos públicos a
favor de acudir a las urnas a 'votar por' las enmiendas"
Caso Núm. CE-94-588, ante; *funcionario que, inclusive, fue
designado al cargo que ocupa por la anterior administra-
ción de gobierno.* Realmente nadie tiene derecho, aun
cuando dicho en forma indirecta y fina, a "manchar" la re-
putación de una persona de esa forma; esto es, de manera
irresponsable.

## II

Este planteamiento totalmente absurdo —y, por que no
decirlo, este disparate— que sostiene el P.I.P. en su lla-
mada solicitud de auxilio de jurisdicción es el que, sorpren-
dentemente, la mayoría de los integrantes del Tribunal
*considera y acoge* y al que le brinda *tratamiento prioritario*
mediante la Resolución que hoy se emite. *¿Cómo es ello
posible? ¿Por qué razón es que la Mayoría acoge y atiende
una solicitud tan obviamente inmeritoria?* Dicha acción,
*naturalmente,* tiene que tener una explicación. La misma,
después de todo, resulta ser sencilla.

La mayoría de los integrantes de este Tribunal aparen-
temente está lista para declarar inconstitucional la Ley
Habilitadora del Referéndum de 1994(²) y/o para enmendar
judicialmente la misma, a su antojo, so color de que dicha
legislación es defectuosa. Se enfrentan, sin embargo, a *dos*
(2) obstáculos. *No* saben *ni* pueden precisar, *en primer lu-
gar,* en qué momento preciso será que el tribunal de ins-

---

(²) En cuyo referéndum la ciudadanía de este País decidirá, entre otras cosas, si
procede o no, aumentar el número de los integrantes de este Tribunal.

tancia finalmente emitirá su decisión sobre el asunto de la constitucionalidad de la referida Ley; no teniendo autoridad el Tribunal, *de ordinario*, para "obligar" a dicho foro a resolver el asunto en determinado período de tiempo. *Por otro lado*, y en esta etapa de los procedimientos, *no* cabe la menor duda de que el Tribunal *carece de jurisdicción* para expresarse sobre, y determinar, si la mencionada Ley es o no constitucional.([3])

*¿Qué hacer?* La mayoría se ve "obligada", como reza el refrán popular, a "forzar el *issue*". Utilizan la inmeritoria solicitud de auxilio de jurisdicción, radicada por el P.I.P., *para vencer los dos obstáculos a los que ahora se enfrentan*. En otras palabras, la errónea e improcedente utilización de la referida solicitud de auxilio le permite *controlar*, de manera precisa y absoluta, el término de tiempo que tendrá el tribunal de instancia para resolver el asunto de la constitucionalidad de la citada Ley Núm. 49. Como hemos visto, le conceden a dicho foro judicial el término de cinco (5) días para resolver el mismo; decisión que, una vez emitida, obviamente será prontamente apelada ante este Tribunal por la parte que en dicho foro judicial resulte perdidosa. Ese recurso de apelación, a su vez, le *brindará jurisdicción* a este Tribunal para expresarse sobre, y resolver, si la Ley Habilitadora del Referéndum de 1994 es, o no,

---

([3]) Ello así ya que, en esta etapa de los procedimientos, *únicamente* está ante la consideración del Tribunal la *resolución interlocutoria* emitida por el foro de instancia determinando que le son aplicables al referéndum en controversia las disposiciones del Art. 8.001 de la vigente Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351. Esto es, *no* existe sentencia final del tribunal de instancia decretando la constitucionalidad, o inconstitucionalidad, de la Ley Núm. 49 de 2 de agosto de 1994 (16 L.P.R.A. sec. 956 *et seq.*), que pueda haber sido objeto de un recurso de revisión, *así como tampoco* existe ningún pronunciamiento interlocutorio del foro de instancia a esos efectos que pueda ser revisado mediante recurso de *certiorari*.

Tampoco debe olvidarse que —como correctamente ha señalado la Comisión Estatal de Elecciones en una de sus comparecencias— una moción en auxilio de jurisdicción siempre es, como su nombre lo indica, un apéndice del recurso principal pendiente ante el Tribunal. Esto es, no se puede utilizar en el presente caso el subterfugio de una moción en auxilio de jurisdicción, radicada en los recursos de *certiorari* presentados por los aquí peticionarios —en revisión de la resolución y orden, interlocutoria y específica, que emitiera el foro de instancia— para declarar inconstitucional la Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994.

constitucional. No hay duda de que la referida actuación mayoritaria, *aún cuando errónea e improcedente en derecho*, es ingeniosa e imaginativa.

*En conclusión,* somos del criterio que lo correcto y procedente en derecho es *denegar* la solicitud de auxilio de jurisdicción que ante este Tribunal ha radicado el P.I.P. en el presente recurso. La radicación del mismo, dentro de los recursos de *certiorari* que radicaron los demandados peticionarios, resulta ser no sólo improcedente en derecho sino que prematura. De la Comisión embarcarse en el futuro, como especulativamente lo asegura el P.I.P. que lo hará, en una campaña ilegal, dicho partido político podrá, *entonces,* plantear dicho asunto ante la propia Comisión Estatal de Elecciones; ello conforme lo establecen las disposiciones pertinentes de la vigente Ley Electoral de Puerto Rico, decisión de la Comisión que podrá ser *revisada* ante el foro judicial.

## III

Esta errónea y lamentable actuación del Tribunal se lleva a cabo —*desafortunadamente para nuestro ordenamiento y sistema de justicia*— en una situación en que este Foro obviamente tiene, por decirlo así, un "interés particular y especial". Como es de todos conocido, la mayoría de los integrantes del Tribunal —de manera oficial y públicamente— ha expresado *su repudio* a una de las propuestas contenidas en el referéndum en controversia y ha conminado a todos los integrantes de la Rama Judicial para que así, igualmente, lo hagan.

*El Tribunal, en el presente caso más que en cualquier otro, debe de actuar con suma cautela, corrección y pulcritud; cuidándose de que no se le pueda imputar prejuicio o falta de objetividad.* Resulta conveniente recordar que "la justicia, después de todo, comienza por nuestra propia casa".

— o —

Voto explicativo de conformidad emitido por la Juez Asociada Señora Naveira de Rodón.

Quisiéramos dejar claramente establecido que ante este Foro en estos momentos no está planteada la posible inconstitucionalidad de la Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994, Ley Núm. 49 de 2 de agosto de 1994 (16 L.P.R.A. sec. 956 *et seq.*). Se nos ha solicitado que revisemos la corrección de una Resolución y Orden emitida por el Tribunal Superior, Sala de San Juan, mediante la cual éste determinó que el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, "tiene plena vigencia en lo referente al Referéndum programado para el 6 de noviembre de 1994". En consecuencia ordenó "a la Comisión Estatal de Puerto Rico [CEE] a nombrar la Junta de Anuncios de forma tal que ésta pueda EVALUAR la necesidad de publicación de todo anuncio gubernamental hasta el día del Referéndum". (Enfasis en el original.) Además, tenemos ante nuestra consideración una solicitud de remedio provisional de los codemandantes Rubén Berríos Martínez, el Partido Independentista Puertorriqueño y Manuel Rodríguez Orellana, para que, en auxilio de nuestra jurisdicción, ordenemos "a la C.E.E. que de inmediato cese y desista de gastar los fondos asignados por la Ley Número 49 del 2 de agosto de 1994, hasta tanto se haya resuelto definitivamente si el esquema de financiamiento dispuesto en la Ley Habilitadora para el Referéndum del 6 de noviembre es constitucional".

Es sobre estos dos (2) planteamientos de derecho que las partes han comparecido y argumentado.

Procesalmente los cuestionamientos constitucionales sobre la Ley Núm. 49, *supra,* se encuentran pendientes de ser resueltos por el tribunal de instancia. Este Foro no tiene facultad para acoger los escritos presentados, de *cer-*

*tiorari* o remedios provisionales, como solicitudes de *injunction*, sentencia declaratoria o certificación y proceder de esta forma a resolver, en primera instancia, los planteamientos de inconstitucionalidad que se están haciendo ante el Tribunal Superior. No tenemos jurisdicción original para entender en una acción de *injunction* ni en una de sentencia declaratoria, Reglas 56.5 y 59.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III; y una certificación, por su naturaleza, sólo procede cuando el caso se ha visto en el foro de instancia y se encuentra pendiente en un foro apelativo o de una jurisdicción a otra, Regla 53.1(c) de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Ante las circunstancias previamente descritas, resulta ineludible concluir que cualquier pronunciamiento, en estos momentos, sobre los planteamientos de inconstitucionalidad de la Ley Núm. 49, *supra*, que se encuentran ante la consideración del tribunal de instancia, sería prematuro y a destiempo, que le haría un flaco servicio a los fines de la justicia. Después de todo, las partes aún no han tenido ni siquiera la oportunidad de elaborar sus planteamientos constitucionales ante nosotros. El curso procesal que hoy adopta el Tribunal es el apropiado.